# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

ROBERT F. COPPA,
*Plaintiff,*

**CA11- 459**

v.                                                   C.A. no. _____

BANK OF AMERICA, N.A.,
*Defendant.*

*FILED*

*OCT 0 7 2011*

*U.S. DISTRICT COURT*
*DISTRICT OF R.I.*

## COMPLAINT

## I.   PARTIES, JURISDICTION, AND VENUE

1.      Robert F. Coppa is a Rhode Island resident and former employee of Bank of America, N.A.

2.      Bank of America, N.A. ("BANA"), is a subsidiary of Bank of America Corporation ("BAC").  BANA operates many bank branches in Rhode Island, conducts substantial business in Rhode Island, and employs a significant workforce in Rhode Island.  BAC is a North Carolina corporation with a principal place of business in Charlotte, North Carolina.

3.      This Court has subject matter jurisdiction over this suit according to 28 U.S.C. § 1331.

4.      This Court has personal jurisdiction over BANA because it does significant business in Rhode Island, can be served in Rhode Island, and committed many of the acts giving rise to Mr. Coppa's claims in Rhode Island.

5.      Pursuant to 28 U.S.C. § 1391(b)-(c), Venue is proper in this District because it is a judicial district in which BANA is subject to personal jurisdiction at the time this action was commenced.

6.      On July 20, 2009, Mr. Coppa filed a charge of age discrimination with the Rhode Island Commission for Human Rights ("Commission").

7.      In a letter dated June 3, 2011, the Commission announced that it found probable cause to believe that BANA discriminated against Mr. Coppa on the basis of age.

8.      On July 12, 2011, the Commission issued Mr. Coppa a notice of right to sue.

9.      On September 28, 2011, the Equal Employment Opportunity Commission issued Mr. Coppa a notice of right to sue.

## II.     FACTS

10.     All paragraphs above and below are incorporated here by reference as if repeated here in full.

11.     Mr. Coppa was first hired by one of Bank of America's predecessors-in-interest, Rhode Island Hospital Trust ("RIHT"), in 1968.

12.     Bank Boston bought RIHT in approximately 1985.

13.     Mr. Coppa was promoted to vice president of credit administration of Bank Boston.  Mr. Coppa left Bank Boston in 1993.

14.     In 1994, Fleet Bank (another BANA predecessor-in-interest) hired Mr. Coppa as Finance Manager for Consumer Banking in Providence, Rhode Island.

15.    Fleet promoted Mr. Coppa to Finance Manager of the Private Bank/Wealth Management Department in approximately 1996.

16.    In 2001, Mr. Coppa was asked to set up and manage Fleet's Contractor Vendor Management department to help improve Fleet's use of outside vendors hired to work on the bank's many types of computerized systems.

17.    BANA bought Fleet in 2004.

18.    In 2004, Mr. Coppa became vice president/operations manager for Contract Vendor Management at BANA.

19.    Mr. Coppa was in charge of overseeing and approving BANA's expenditure of approximately $400,000,000 a year on wages for approximately 2500 to 3000 temporary computer information technology ("IT") contract workers from four major outside vendors performing computer work for BANA.

20.    Mr. Coppa's primary responsibilities were: (1) making sure that BANA managers and executives were bidding on vendors in an efficient manner, according to BANA policies; (2) ensuring that BANA vendors were completing tasks on time, under budget, and according to BANA needs and policies; (3) reviewing and approving all requests for temporary IT staff; (4) approving BANA's disbursement of funds payable to all temporary IT workforce vendors; (5) maintaining professional relationships with BANA hiring managers and existing IT staffing vendors; (6) evaluating prospective vendors; and (7) maintaining complete control over all reporting to BANA managers and controllers.

21.    In approximately 2005, Rob Robinson, a senior vice president, left BANA.

22.    Shortly thereafter, Mr. Coppa was assigned Mr. Robinson's supplier manager duties and was promoted to Vice President, Supplier Manager and Vendor Relations Manager.

23.    In his capacity as supplier manager, Mr. Coppa managed BANA's relationship with five major worldwide temporary IT staffing vendors.  Mr. Coppa managed and supervised account representatives from each major vendor, communicating with each of them on a daily basis as well as conducting and chairing a quarterly 'scorecard' review in-person meeting, ensuring that all BANA standards were met.

24.    After taking on supplier manager responsibilities, Mr. Coppa also retained his Contract Vendor Management responsibilities.

25.    As part of his contract vendor management responsibilities, Mr. Coppa had the responsibility of regularly working closely with approximately 200 BANA managers and approximately 30 BANA controllers-- in many of BANA's lines of businesses --to help forecast and budget the temporary IT staffing expenses.

26.    In 2006, Mr. Coppa was tasked with switching his department's work to a new computerized expense management and procurement system called ARIBA.

27.    Mr. Coppa completed the sixteen-month transition project two months early.

28.    From this point until the date he was terminated, Mr. Coppa was the only employee at BANA knowledgeable in using the ARIBA reporting tool.  In a handwritten note, BANA CEO Ken Lewis commended Mr. Coppa on his knowledge of ARIBA in approximately the first quarter of 2007.

29.     In approximately June, 2007, Mr. Coppa's position was moved into BANA's Human Resources department.

30.     Mr. Coppa made approximately two trips to North Carolina per quarter for meetings with his supervisor.  Mr. Coppa met with BANA vendors approximately two times per month in Rhode Island.

31.     Mr. Coppa's manager was Dan Takah.

32.     Mr. Takah reported to Christopher Payton.

33.     Upon information and belief, Mr. Payton and Mr. Takah were under 40 years of age at all times relevant to this suit.

34.     In October, 2008, Mr. Takah informed Mr. Coppa that Mr. Payton was hiring a woman named Christie Allen to act as Mr. Coppa's assistant.  Mr. Payton was anxious to send out a formal communication of this new addition to the department.  Mr. Takah tracked down Mr. Coppa while he was on vacation so that Mr. Takah could inform Mr. Coppa of his new assistant prior to Mr. Payton getting out the official announcement to everyone else.  Mr. Takah told Mr. Coppa that Ms. Allen was being moved from another job at BANA.

35.     Christie Allen was 35 years old at the time, twenty-five years younger than Mr. Coppa.

36.     When Mr. Payton hired Christie Allen, Ms. Allen knew nothing about the technical temporary workforce management process.  Ms. Allen admitted this to Mr. Coppa on several occasions.

37.     Mr. Takah asked Mr. Coppa to give Ms. Allen some of his responsibilities. He assured Mr. Coppa that this was the best way for Ms. Allen to learn the business.

38.    A few weeks later, in late November, 2008, Mr. Coppa found that he was suddenly unable to log in to ARBIA supplier management tool, one of the most important software tools he used in the course of his daily work.

39.    Mr. Coppa learned that a senior vice president in Supply Chain blocked Mr. Coppa's access to the ARIBA supplier management tool. Ms. Allen was given exclusive access to the ARIBA supplier management tool in Mr. Coppa's place.

40.    Mr. Coppa started to worry that Ms. Allen was taking on too many of his responsibilities.

41.    In approximately late November, 2008, Mr. Coppa asked Mr. Takah if he had any reason to worry about his job.

42.    Mr. Takah informed Mr. Coppa that Ms. Allen was taking over his job.

43.    Mr. Takah assured Mr. Coppa that Mr. Coppa knew more about the technical temporary workforce space at BANA than anyone else.

44.    Mr. Takah assured Mr. Coppa that BANA executives wanted Mr. Coppa to take on more visible projects, that he and Mr. Coppa were a team, that Mr. Coppa would always be there, and that Mr. Coppa should not worry about losing his job.

45.    Mr. Takah moved Mr. Coppa to a new position: benchmarking and reporting data for temporary labor contractors used for all BANA departments. This continued his benchmarking and responsibilities over IT contractors but would also eventually include additional oversight of the 20,000 administrative temporary workers used by BANA annually.

46.    On or about December 1, 2008, Clay Lewis, a direct report to Mr. Payton, replaced Mr. Takah as Mr. Coppa's manager.

47.     On December 8, 2008, Mr. Lewis called Mr. Coppa to inform him that BANA had started another round of layoffs and that Mr. Coppa's brand new position was being eliminated.

48.     Mr. Lewis informed Mr. Coppa that about twenty other employees in Human Resources would be laid off at the end of 2008.

49.     Mr. Lewis asked Mr. Coppa to stay on until January 31, 2009, so that Mr. Coppa could train Ms. Allen and the three associates assisting her.

50.     The three associates assisting Ms. Allen were all under 40 years of age.

51.     Mr. Lewis asked Mr. Coppa to compile a detailed list of all his responsibilities, business contacts, and processes from his former position so that Mr. Coppa's knowledge and experience would be passed on to Ms. Allen.

52.     Approximately 20 BANA Human Resources employees were laid off at the end of 2008.

53.     When Mr. Coppa reported to work on January 2, 2009, his building access card had been deactivated and his computer access revoked.

54.     Mr. Coppa called Mr. Lewis about it.

55.     Mr. Lewis informed Mr. Coppa that the woman who processed employees terminated at year-end discontinued building and computer access for Mr. Coppa with the others laid off at year-end.

56.     Mr. Coppa's building and computer access were restored by January 5, 2009.

57.     Between January 5 and January 28, 2009, Mr. Coppa met with Ms. Allen and two of her associates several times to ensure that the transition from Mr. Coppa to Ms. Allen would be successful.

58.     On approximately December 8, 2008, when Mr. Coppa asked Mr. Payton why Ms. Allen was kept and Mr. Coppa fired, Mr. Payton replied, "she's a better fit for 2009 and beyond."

59.     On or about December 9, 2008, a human resources executive told Mr. Coppa that his termination seemed to be based on age and urged him to call "Advice and Counsel," BANA's in-house experts dedicated to ensuring that BANA adheres to employment laws.

60.     In December, 2008, Mr. Coppa spoke with BANA's payroll and 401K vendor, Fidelity. Fidelity told Mr. Coppa that BANA coded his termination as "retirement."

61.     Mr. Coppa contacted Aubrey Long, senior vice president human resources, and informed her that his termination was coded "retirement."

62.     Ms. Long informed Mr. Coppa that Mr. Payton had coded Mr. Coppa's termination as "retirement."

63.     At that time, Mr. Coppa's termination was coded "retirement."

64.     Mr. Payton coded Mr. Coppa's termination as "retirement."

65.     Ms. Long changed the code on Mr. Coppa's termination to "involuntary separation."

66.     On his last day of work, the code on Mr. Coppa's termination was "involuntary separation."

8

67.    Upon information and belief, Mr. Coppa's former responsibilities are currently being performed by Ms. Allen, her three associates, and a vendor named Ajilon/Adecco.

68.    The four employees currently performing Mr. Coppa's former responsibilities were all younger than 40 years of age at the time of Mr. Coppa's termination.

69.    According to the written annual performance appraisals performed by Mr. Coppa's supervisors over the decades he worked for BANA and its predecessors-in-interest, Mr. Coppa's performance always met and exceeded BANA's expectations.

70.    Mr. Coppa never received a written warning from any supervisor during his many decades of service to BANA and its predecessors-in-interest.

## COUNT ONE—AGE DISCRIMINATION IN EMPLOYMENT ACT
### (BANA)

71.    All paragraphs above and below are incorporated here by reference as if repeated here in full.

72.    Mr. Lewis, Mr. Payton, and Mr. Takah are BANA executives, acted as BANA's authorized agents when taking adverse employment actions against Mr. Coppa, and acted with the full knowledge, consent, and ratification of BANA.

73.    Mr. Coppa was part of a group of BANA employees to which an exit incentive or employment termination program ("Program") was offered.

74.    BANA never informed Mr. Coppa of the class, unit, or group of individuals covered by the Program.

75.    BANA never informed Mr. Coppa of any eligibility factors for the Program nor any time limits applicable to the Program.

76.   BANA never informed Mr. Coppa of the job titles and ages of all individuals eligible or selected for the Program.

77.   BANA never informed Mr. Coppa of the ages of all individuals in the same job classification or organizational unit who were not eligible or selected for the Program.

78.   Neither Mr. Lewis, Mr. Payton, Mr. Takah, nor any other BANA executive, employee, or agent ever proffered any performance-related justification for his losing his job to Ms. Allen nor for his being laid off.

79.   Neither Mr. Lewis, Mr. Payton, Mr. Takah, nor any other BANA executive, employee, or agent ever made any effort to find another job for Mr. Coppa within the huge organization after BANA eliminated the position of benchmarking and reporting data for temporary labor contractors.

80.   Mr. Coppa's decades of positive work performance reviews, the lack of written warnings to Mr. Coppa, and Mr. Coppa's decades-long track record of promotions and increasing responsibility at BANA show that Mr. Coppa was more qualified and more experienced than Ms. Allen for the position of Vice President, Supplier Manager and Vendor Relations Manager.

81.   Mr. Lewis, Mr. Payton, Mr. Takah, and BANA replaced Mr. Coppa with Ms. Allen without any explanation or justification.  Subsequently moving Mr. Coppa to a position eliminated days later means that BANA's ultimate termination of Mr. Coppa is similarly lacking in explanation and justification.

82.    Mr. Lewis, Mr. Payton, Mr. Takah, and BANA tried to conceal Defendant's illegal replacement of Mr. Coppa by Ms. Allen by moving Mr. Coppa to a position that was eliminated days later.

83.    Mr. Payton, Mr. Takah, and BANA hired Ms. Allen to replace Mr. Coppa because she is younger than Mr. Coppa.

84.    Mr. Payton, Mr. Takah, and BANA selected Mr. Coppa for termination because he was over 60 years of age at the time of his termination.

85.    BANA's illegal termination of Mr. Coppa was due to his age, in violation of the ADEA, causing him damages, irreparable harm, and emotional distress.

WHEREFORE, Plaintiff ROBERT F. COPPA respectfully requests that this Honorable Court award him front pay, back pay, compensatory damages, consequential damages, punitive damages, injunctive relief, equitable relief, attorneys' fees, costs, and all other relief as this Court deems just and proper.

ROBERT F. COPPA
By His Attorney,

  /s/ Chip Muller
Chip Muller, Esq. (#7686)
Muller Law, LLC
155 South Main Street, Suite 101
Providence, RI 02903
(401) 256-5171 (ph)
(401) 256-5178 (fax)
chip@chipmuller.com

ROBERT F. COPPA by and through his attorney demands a TRIAL BY JURY on all counts so triable, and designates Chip Muller, Esq., as trial counsel.

/s/ Chip Muller
Chip Muller, Esq. (#7686)

Dated: October 7, 2011